IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TODD C.[1],                                              No. 3:17-cv-00550-HZ

        Plaintiff,

   v.

NANCY A. BERRYHILL, Acting                              OPINION & ORDER
Commissioner of Social Security,

        Defendant.


Brian Scott Wayson
P.O. Box 12028
Portland, Oregon 97212

     Attorney for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon

---

    [1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case.  Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

1 - OPINION & ORDER

Renata Gowie
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

Thomas M. Elsberry
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

     Attorneys for Defendant

HERNANDEZ, District Judge:

     Plaintiff Todd C. brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I reverse the Commissioner's decision and remand for additional proceedings.

## PROCEDURAL BACKGROUND

     Plaintiff applied for SSI and DIB on June 13, 2013, alleging an onset date of June 1, 2002. Tr. 179-80 (DIB); 181-87 (SSI). His applications were denied initially and on reconsideration. Tr. 29-53, 112-19 (Initial); 54-80, 122-27 (Recon.). On October 13, 2015, Plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 2-28. On November 10, 2015, the ALJ found Plaintiff not disabled. Tr. 81-101. The Appeals Council denied review. Tr. 102-08.

## FACTUAL BACKGROUND

     Plaintiff alleges disability based on having bipolar disorder, depression, severe anxiety, long-term memory loss, high blood pressure, high cholesterol, and lethargy. Tr. 223. At the time

of the hearing, he was forty-two years old.  Tr. 179 (showing date of birth).  He is a high school

graduate and has past relevant work experience as a truck driver.  Tr. 24, 224.

SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which . . . has lasted or can be

expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§

423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure.  *See Valentine v.

Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step

procedure to determine disability).   The claimant bears the ultimate burden of proving disability.

*Id.*

In the first step, the Commissioner determines whether a claimant is engaged in

"substantial gainful activity."  If so, the claimant is not disabled.  *Bowen v. Yuckert*, 482 U.S.

137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner

determines whether the claimant has a "medically severe impairment or combination of

impairments."  *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the

claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in

combination, meet or equal "one of a number of listed impairments that the [Commissioner]

acknowledges are so severe as to preclude substantial gainful activity."  *Yuckert*, 482 U.S. at 141;

20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if

not, the Commissioner proceeds to step four.  *Yucker*t, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff met the insured requirements for his DIB claim through March 31, 2006, and had not engaged in substantial gainful activity since his alleged onset date. Tr. 86. Next, at step two, the ALJ determined that Plaintiff has severe impairments of anxiety disorder, bipolar disorder, depression, and substance abuse. Tr. 86-87. However, at step three, the ALJ found that Plaintiff's impairments did not meet or equal, either singly or in combination, a listed impairment. Tr. 87-89.

At step four, the ALJ concluded that Plaintiff has the RFC to perform a full range of work at all exertional levels but has several nonexertional limitations. Tr. 89. He can hear and understand simple oral instructions and communicate simple information. *Id.* He must avoid all exposure to unprotected heights and moving mechanical parts. *Id.* He can perform simple, routine, and repetitive tasks. *Id.* He can have occasional interaction with supervisors and only brief and superficial contact with coworkers. *Id.* He can have no contact with the public. *Id.*

With this RFC, the ALJ determined that Plaintiff is unable to perform his past relevant work.  Tr. 94.  However, at step five, the ALJ determined that Plaintiff is able to perform jobs that exist in significant numbers in the economy such as janitor, cleaner 2, and laundry worker.  Tr. 95.  Thus, the ALJ determined that Plaintiff is not disabled.  Tr. 95-96.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (internal quotation marks omitted).  The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision.  *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed."  *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues that the ALJ made the following errors: (1) finding his subjective testimony not credible; (2) rejecting the opinion of a treating practitioner; (3) failing to find him disabled at step three; and (4) rejecting lay witness testimony.

I.  Plaintiff's Credibility

The ALJ is responsible for determining credibility.  *Vasquez*, 572 F.3d at 591.  Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  *Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons'"); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility:  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain.  *Id.*; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors

in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in *Molina*;

> In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation. For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.] While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.] Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

*Molina*, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

The ALJ applied the correct two-step analysis. Tr. 89. The ALJ summarized Plaintiff's subjective symptom statements including that he has to be careful not to trigger manic episodes, he has high anxiety which makes it difficult for him to articulate things, he has high anxiety around authority figures, and his anxiety is triggered by new environments, new experiences, new people, and crowds. *Id.* The ALJ also noted Plaintiff's statements that he is introverted and has few friends and that his medications cause memory problems and weight gain. *Id.* The ALJ described features of his manic episodes including alcohol abuse, inability to sleep, and an inability to remember what has happened. *Id.*

While acknowledging that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible. Tr. 89-90. First, the ALJ recited medical evidence showing that when Plaintiff abstains from alcohol and maintains his medication regimen, he is "quite functional" and that after his "last hospitalization" in March 2013, the record showed that his symptoms had generally been stable and had continued to be controlled with treatment. Tr. 90. Second, the ALJ found that Plaintiff inconsistently reported the extent of his marijuana and alcohol use which lessened the credibility of his allegations. Tr. 92. Third, the ALJ noted that he had a poor work history since 2000, implying that he does not desire to work, not that he is disabled from doing so. *Id.* Finally, the ALJ found that Plaintiff's daily activities were inconsistent with his complaints of disabling symptoms and limitations, including his alleged limitations in social functioning. *Id.*

I conclude that the ALJ did not fairly interpret the record regarding Plaintiff's prior inconsistent statements as to his past substance abuse and further, that the alleged daily activities are not inconsistent with this testimony. Additionally, the ALJ did not acknowledge that Plaintiff actually stopped working in 2001, not 2000, and with an alleged onset date of June 2002, there is no basis for inferring that a lack of desire prevented him from working. Finally, while the medical record generally supports the ALJ's findings regarding Plaintiff's improvement since March/April 2013, inconsistency with the objective medical record alone is not a basis for rejecting a claimant's subjective testimony.

/ / /

/ / /

A.  Statements Regarding Substance Abuse

1.  Alcohol

The ALJ cited to Plaintiff's May 2012 report that he had had no alcohol for three years, other than a few six-packs of beer.  Tr. 92 (citing Tr. 324).  Then, in April 2013, Plaintiff reported that he had consumed no alcohol since October 2008 but had relapsed six months ago. *Id.* (citing Tr. 341).  The ALJ found these records to be inconsistent.  But, by referring to a relapse which had occurred six months before April 2013, Plaintiff was indicating that the relapse occurred in October 2012 which is *after* the May 2012 report. Thus, there is no inconsistency between the April 2013 record and May 2012 report of having no alcohol for three years other than a few six packs.  And, while Plaintiff said in May 2012 that he had not had alcohol for three years, meaning sometime in 2009, his report in April 2013 that he had not had alcohol since late in 2008 is not so remarkably inconsistent as to find him not credible. Additionally, the ALJ failed to mention that the May 2012 report was made during a psychiatric hospitalization and was reported in a chart note which stated that Plaintiff was only a poor to moderately reliable historian.  Tr. 324.

Next, the ALJ noted that in June 2013, Plaintiff reported being sober for three years.  Tr. 92 (citing Tr. 384).  The record actually first states that Plaintiff reported using alcohol until a "few years ago." Tr. 384.  It then states that he had been sober for three years.  *Id.*  The references here are vague.  A "few years ago" could reasonably mean three, four, or five years, putting the end of Plaintiff's use of alcohol in the 2008 or 2009 time period he previously referred to.  The ALJ also noted that at that time, Plaintiff reported having a relapse two months previously.  Tr. 92 (citing Tr. 384).  The chart note states that he "[w]ent on a bender" two

months ago when he moved back home with his parents and had not had alcohol again in the last two months. Tr. 384. Two months prior would put the "bender" incident sometime in April 2013. Given that the April 2013 chart note is from April 5, 2013, Tr. 341, it is quite possible that this "bender" had not occurred at the time of the April 2013 chart note and thus, the April and June 2013 statements are not inconsistent. The ALJ next noted that in May 2014, Plaintiff reported not using alcohol in two years. Tr. 92 (citing Tr. 422). The ALJ noted that one month later, he stated he had had no alcohol for six years except for one day, one year prior. *Id.* (citing Tr. 421). The ALJ fails to mention that the report of no alcohol for six years is consistent with his prior report that he stopped drinking in 2008. And, the reference in June 2013 to having consumed alcohol one day, "a year ago," is largely consistent with his report of the "bender" in April 2013.

### 2. Marijuana

The ALJ noted that in May 2014, Plaintiff reported using marijuana only once in the past two years and he thought it made his symptoms worse. Tr. 92 (citing Tr. 422[2]). Then, in August 2015, he reported that he smoked marijuana daily, but indicated his psychiatrist was unaware of this. Tr. 92 (citing Tr. 435). There is nothing inconsistent between Plaintiff's May 2014 report that he had not used marijuana but once in two years, and his August 2015 statement then fifteen months later that he was then using it daily. The ALJ also noted that at the October 2015 hearing, Plaintiff reported that he used marijuana daily, and had been doing so for four months.

---

[2] This record spans more than one page and the references to Plaintiff's marijuana use are found at page 423, not 422. While the record indicates Plaintiff's history of marijuana use generally and his report that he has used it only once in two years, the Court cannot find the reference on either page 422 or 432 to his report that it made his symptoms worse.

Tr. 92; *see* Tr. 21-22. This is actually consistent with his August 2015 report of daily use at that time.

Overall, while there are a few inconsistencies in Plaintiff's report of alcohol use, no evidence suggests that Plaintiff was intentionally misleading his providers. These few inconsistencies do not provide substantial evidence to support a determination that Plaintiff is not generally credible. Especially considering Plaintiff's mental health history and that some of his statements were made in a hospital setting while in acute psychosis, the ALJ's reliance on a few inconsistences regarding his alcohol use history is not convincing. And, there are no apparent inconsistencies in his reports of marijuana use. Thus, the ALJ's reliance on Plaintiff's inconsistent substance abuse history statements is not a clear and convincing reason supported by substantial evidence in the record to reject all of his subjective testimony.

B. Activities of Daily Living

The ALJ cited a number of Plaintiff's activities that the ALJ found undermined Plaintiff's allegations of disabling symptoms. Tr. 92. The ALJ cited Plaintiff's attendance to personal care needs, completion of household chores and meal preparation, lack of difficulty following movies, ability to use a flight simulator on a computer, prior living in a group home with roommates, attending group classes upon release from prison, leaving his house on his own, taking his dogs for walks and sometimes to the dog park, shopping once per week, leaving his house every day in April and July 2013, using public transportation, spending time with friends and family, going to a gym, and occasionally going out to eat. *Id.* The ALJ found that these activities show Plaintiff has some capacity to be around people. *Id.* The ALJ also relied on Plaintiff's performance of odd jobs since his release from prison in 2010, which the ALJ acknowledged was not steady

work, but still showed he was capable of performing some simple tasks. *Id.*

As *Molina* makes clear, there are two ways a claimant's daily activities may undermine a claimant's testimony that he or she suffers from disabling limitations. One is when the activities are transferable to a work setting. The other is when the activities contradict claims of a totally disabling impairment. The ALJ's opinion does not indicate that Plaintiff's activities are transferable to a work setting. Thus, the issue is whether the activities contradict his statements about his limitations.

The record shows that Plaintiff rarely cooks for himself and prepares only things like cold cuts or eats energy bars. Tr. 249, 257. He occasionally helps his mother prepare meals. *Id.* At the hearing, he said he "make[s] dinner," but provided no other context for that endeavor. Tr. 17. He shops with his mother, not alone. Tr. 18. He primarily gets around by his mother driving him, Tr. 18, 387. He visits family and friends, goes to a gym, and sometimes goes out to eat. *See, e.g.*, Tr. 248, 251 (July 2013 report). But, he also reported not going out socially any longer and an inability to leave the house sometimes. Tr. 202, 252. At the hearing, he testified that he did not get out much. Tr. 18.

Notably, Plaintiff's group living situation and living with roommates was in a "halfway house"[3] upon discharge from jail. *See* Tr. 315 (Mar. 2013 report that he had recently spent three weeks in jail and was released to "Bridges to Change" where he was living with eight "other guys"); Tr. 343-44 (Apr. 2013 report that he had recently been in jail for twenty-eight days, had

---

[3] Because Plaintiff uses the term "halfway house" in his briefing, Pl.'s Op. Brief 1, 10, ECF 17, I also use the term although I have no specific information about the actual services offered there and cannot determine myself the accuracy of the characterization of these residences as "halfway houses."

gone to Bridges to Change, but could not stay there and was now in a new group home called Knapp House).  The ALJ found that Plaintiff's ability to live in a group home with roommates undermined his allegation that he had difficulties with people and new situations.  But, basing that finding on what was likely a required residence at a halfway house upon release from prison is not reasonable.  This is especially true when the record indicates he had problems at one home and had to switch to another.

Plaintiff's subjective allegations are essentially that while he engaged in occasional activities such as shopping with his mother, visiting friends, performing occasional odd jobs, playing with a flight simulator, watching a movie, and performing some household chores, his mental impairments impact his ability to sustain concentration, follow through and remember instructions, and be exposed to new situations, new people, and crowds.  The activities cited by the ALJ do not clearly contradict these subjective limitations.  Thus, the ALJ erred in relying on Plaintiff's daily activities to undermine his subjective allegations.

C.  Work History

The ALJ found that a "review of the claimant's work history reveals he has not worked steadily since 2000."  Tr. 92.  The ALJ cited no records in support.  Plaintiff reported being a truck driver from 1999 to 2001.  Tr. 233.  His earnings record shows income earned in 2000 and 2001.  Tr. 189, 194.  Although he earned much less in 2001 than he did in 2000, he still reported income for 2001.  *Id.*  The record indicates that the income in 2001 was from driving a truck, the same as income earned in previous years.  Tr. 192-93.

The ALJ may be correct that after 2000, Plaintiff did not work steadily.  But, he did work some in 2001.  And, given that his alleged onset date is June 2002, the record does not show a

prolonged history of being out of work before his alleged onset date.  *Cf. Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (ALJ properly relied on claimant's "extremely poor work history" which showed "little propensity to work in her lifetime" based on years of unemployment between jobs, even before she claimed to be disabled).  It was unreasonable for the ALJ in this case to infer that Plaintiff had a history of being out of work before his alleged onset date such that he lacked the desire to work.

D.  Medical Evidence

Finally, the ALJ found that the medical evidence showed that as of March 2013, Plaintiff's symptoms had stabilized and were fairly controlled on medication.  This, the ALJ reasoned, contradicted his allegations of disabling symptoms.  The ALJ spent two full, single-spaced pages reciting the medical evidence.  Tr. 90-91.

The ALJ noted several places in the record showing that after his March 2013 hospitalization, Plaintiff's symptoms stabilized and were controlled with treatment.  The ALJ first cited to records from Plaintiff's primary care provider Dr. Robert Sayson, M.D.  Tr. 90-91 (citing Tr. 387 (Apr. 16, 2013 chart note referring to Plaintiff as pleasant); Tr. 386 (May 14, 2013 chart note where Plaintiff reported "[e]verything working well"; complaint of low energy but it was "evening out" with his medications; observed to be mentally oriented with no manic thoughts or depression); Tr. 385-86 (June 4, 2013 chart note referred to main problem being tiredness and daytime somnolence likely due to medication; noting manic phase had resolved and observing Plaintiff as calm and pleasant); Tr. 381 (Sept. 3, 2013 chart note indicating that Plaintiff's mother thinks he is "much better" on new medications; Plaintiff reported he had been exercising and liked mountain biking; noted to be less depressed and less anxious); Tr. 438-39

(Mar. 5, 2014 chart note noting that Plaintiff reported doing well with his medications, sleeping well if he avoided coffee late in the day, and anxiety controlled; no manic symptoms observed; no depression; noted to be cheerful); Tr. 438 (Mar. 7, 2014 chart note showing that Plaintiff's mother's concern that he was not sleeping led to his going to the emergency department but he had just increased the dose of one of his medications, there was no evidence of mania, Plaintiff was stable and was discharged); Tr. 437 (Mar. 12, 2014 chart note indicating that Plaintiff was admitted to Adventist Hospital because he was having insomnia and mania with increased anger toward father; physician there changed his medications and Plaintiff was now sleeping better, although only about five to six hours; he reported feeling better toward his father; he exhibited no mania and was cooperative and pleasant)).

Next, the ALJ cited to records from Plaintiff's mental health care providers, including psychiatrist Dr. Patricia Gardner, M.D. Tr. 91(citing Tr. 419 (June 20, 2014 assessment by Dr. Gardner noting Plaintiff reported sleeping about eight hours most nights, mood was level on his current medications but he was unhappy about weight gain as a result, and experiencing anxiety; observed to be calm with good eye contact, open and forthcoming in interview with logical, sequential, and pertinent thought process; Dr. Gardner felt his prognosis overall was fair to good); Tr. 405-13 (spring 2015 chart notes indicating he reported doing better, had maintained stability with his symptoms in the last year, and that he had presented appropriately and with good hygiene, had appropriate speech and tone and a friendly attitude; had a euthymic mood and congruent affect, was oriented with goal-directed thought process, had good attention, intact memory, and fair judgment); Tr. 415 (Apr. 2015 chart note indicating prognosis was good); Tr. 405 (May 15, 2015 chart note indicating complaint of feeling down with low energy, low

motivation, and low mood; however, mental status exam was normal); Tr. 416 (May 19, 2015 chart note indicating Plaintiff reported doing well after having Wellbutrin increased and reporting mood as 6 out 10 with 10 being the best); Tr. 443 (Aug. 21, 2015 chart note that he had been doing well, that hypnosis and acupuncture were helping his anxiety, and eating and sleeping well; denied mood swings, temper outbursts, or psychosis; normal mental status exam); Tr. 441 (Sept. 25, 2015 chart note indicating report of stable mood)).

The ALJ's citations to the record are mostly correct. The ALJ accurately summarized Plaintiff's primary care and mental health records since March 2013. And, other than a brief hospitalization in March 2014, the ALJ's characterization that since his March 2013 hospitalization he was fairly stable and his symptoms were controlled with medication, is reasonable based on the records.[4] Overall, the ALJ's conclusion that since the March 2013 hospitalization, the record shows that Plaintiff's symptoms have generally been stable and have

---

[4] The March 2014 incident is a bit unclear as related in Dr. Sayson's records. On March 7, 2014, a chart note from Dr. Sayson states that he received a fax from "LGSH-ER" which I assume refers to Legacy Good Samaritan Hospital's Emergency Room, indicating that Plaintiff was seen on that date due to his mother's concern that he had slept only three hours. Tr. 438. The chart notes also states "[h]e has just increased Depakote. No evidence for mania." *Id.* Dr. Sayson wrote that Plaintiff was stable and discharged without "meds" with a follow up with Dr. Sayson next week. *Id.* Then, on March 12, 2014, he had an office visit with Dr. Sayson and reported having been admitted to "Adventist hospital" on an emergency room hold from March 7, 2014 to March 9, 2014, because he was having insomnia and mania with increased anger toward his father. Tr. 437. The physician there took him off of Prozac and changed "directions" on other medications. *Id.* Plaintiff was now sleeping better, although still only about five to six hours, but he was feeling better towards his father and appeared cooperative and pleasant. *Id.* This chart notes indicates that Dr. Sayson reviewed the records from the Adventist Hospital admission. *Id.*

The Administrative Record does not contain the actual hospital records from either hospital for these dates. The only logical inference from these chart notes in Dr. Sayson's records is that Plaintiff went to Legacy Good Samaritan Hospital on March 7, 2014, was not admitted and was discharged as stable, but that later that day, he went to Adventist Hospital where he was admitted for two or three days.

been well controlled with treatment and medication is supported by substantial evidence in the record. The April 2013 hospitalization is reasonably understood as part of the March 2013 episode. While the ALJ neglected to note the March 2014 hospitalization, the record on that admission is a bit confused and there are no records from the hospital indicating what exactly occurred. The summary provided in Dr. Sayson's chart note was accurately characterized by the ALJ as showing that the hospital changed his medications which addressed Plaintiff's symptoms.

Nonetheless, while the post-March/April 2013 medical evidence appears to undermine Plaintiff's subjective testimony, the ALJ may not rely only on an inconsistency with objective medical evidence to reject subjective symptom testimony. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) (2015); *Rollins v. Massanari*, 261 F.3d 853, 856, 857 (9th Cir. 2001) ("Once a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain[;] . . . While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects.") (internal quotation marks and brackets omitted) .

Here, the other bases for the ALJ's rejection of Plaintiff's subjective symptom testimony are not clear and convincing reasons supported by substantial evidence in the record. Because there are no other reasons, the ALJ may not rely only on the inconsistency with the objective medical record to reject this testimony. Accordingly, the ALJ's credibility determination was in

error.[5]

II. Treating Psychologist

If a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). If the treating physician's opinion is not contradicted by another doctor, the ALJ may reject it only for "clear and convincing" reasons supported by substantial evidence in the record. *Ghanim*, 763 F.3d at 1160-61.

Even if the treating physician's opinion is contradicted by another doctor, the ALJ may

---

[5] It appears that in the extensive recitation of the medical evidence, the citations provided by the ALJ include both objective medical evidence as well as statements Plaintiff made to his providers. *E.g.*, Tr. 405 (showing normal mental status exam); *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (psychologist's mental status exam is an "objective measure"); Tr. 438-39 (Plaintiff reported doing well). The ALJ may reject a claimant's subjective testimony if it is inconsistent with other statements made by the claimant. *E.g.*, *Tommasetti*, 533 F.3d at 1035. Here, however, the ALJ did cite prior inconsistent symptom statements as a basis for discrediting Plaintiff's testimony. Thus, I may not consider that as a reason to affirm the ALJ's decision. *Trevizo v. Comm'r*, 871 F.3d 664, 677 n.4 (9th Cir. 2017) (district court erred in looking beyond ALJ's stated reasons and explanation to support ALJ's opinion); *Marsh v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) (court cannot affirm the agency on a ground not invoked by the ALJ without violating the *Chenery* rule) (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (stating that a reviewing court may affirm agency action only on "the grounds invoked by the agency")). However, as discussed below, given the ALJ's discussion of the medical evidence, I remand the case to the agency for additional proceedings because the medical evidence requires further consideration by the ALJ.

Additionally, as Plaintiff notes, even if the medical evidence shows improvement since March/April 2013, Plaintiff's alleged onset date is 2002 and the ALJ's rationale fails to address the time period after the alleged onset date but before the March/April 2013 time period. While Plaintiff's insured status for his DIB claim expired in 2006, the ALJ failed to discuss the medical evidence relevant to that claim. This is another reason supporting remand for additional proceedings.

not reject the treating physician's opinion without providing "specific and legitimate reasons" which are supported by substantial evidence in the record. *Id.* at 1161; *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). And, when a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the ALJ must still articulate the relevant weight to be given to the opinion under the factors provided for in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6) (2015); *Ghanim*, 763 F.3d at 1161; *Orn*, 495 F.3d at 632-33.

On September 19, 2013, and then again on March 14, 2014, William "Bob" Madison, Ph.D., wrote a letter regarding his treatment and assessment of Plaintiff.[6] Tr. 399-400, Tr. 401-02. Dr. Madison stated that he first saw Plaintiff June 21, 2012, and since that date, Plaintiff had been attending counseling with him once every two weeks. Tr. 399, 401. Dr. Madison performed a mental health assessment including an interview with history and a personality assessment inventory (PAI). *Id.* Based on these examinations, he diagnosed Plaintiff with post-traumatic stress disorder (PTSD), schizoaffective disorder with paranoia, major depression, generalized anxiety disorder, and stress. *Id.* He described the findings and symptoms related to his diagnoses. *Id.* at 399-400, 401-02. His observations and findings included that Plaintiff has "much paranoia in his thinking as well as disorganization"; Plaintiff's anxiety involved both places and people and when "he has a chance to get comfortable with a new situation, he can sometimes settle in with effort but it takes work"; and that an anti-depressant was being considered as an addition to his medications. *Id.* Dr. Madison indicated that Plaintiff has violent mood swings and thought processes, sometimes he is depressed and other times he is very angry.

---

[6] The letters are identical, although they are dated almost six months apart.

*Id.* He is not able to stop and consider the consequences before acting out on people. *Id.*

Dr. Madison remarked that Plaintiff had been taken to a locked mental health ward of a local hospital recently for observation and treatment where he stayed for several days. Tr. 400, 402. He noted that Plaintiff's medications were adjusted and he received counseling. *Id.* Dr. Madison opined that such hospitalizations, "will probably be a periodic event for Todd for the foreseeable future[.]" *Id.* Dr. Madison also opined that Plaintiff must stay in stress-free environments and situations to keep his mental health stable which presents a problem for the work environment. *Id.* He wrote:

> Whether competitive or not, the stress of any work environment would definitely increase his symptoms. Unscheduled breaks would be the least of the things happening in the workplace. The question of being absent more than a few days per month was asked. In my opinion, I doubt he could function at the simplest job more than one day per week if that much.

*Id.* Dr. Madison continued:

> My professional opinion is that he may be somewhat, but not completely stabilized on medication. I have worked with these types of patients intensively and find that it will be difficult if not impossible for him to obtain and hold employment. Based on my training and 25 years of working in the mental health field, Todd is one of those people who needs a high level of care and support.
>
> He is not stable in the community without the proper medications and support and any stress adds to his instability. I do not believe it is advisable for him to work and I believe he is disabled.

*Id.*

The ALJ gave Dr. Madison's opinions "limited weight." Tr. 93. First, the ALJ found that his opinions were "inconsistent with the rest of the medical record that shows the claimant has remained relatively stable for over two and a half years with no need for hospitalizations." *Id.* Second, the ALJ found Dr. Madison's opinions to be inconsistent with the opinions of Plaintiff's

other providers. *Id.* Finally, the ALJ found that Dr. Madison's opinions were inconsistent with Plaintiff's activities of daily living, which, according to the ALJ, demonstrate he is capable of at least simple work. *Id.*

Plaintiff argues that the ALJ erred in rejecting Dr. Madison's opinions because the ALJ's reference to being inconsistent with the rest of the medical record was vague, the ALJ failed to develop the record, Dr. Madison's opinions were not actually inconsistent with any opinions offered by Dr. Sayson and Dr. Gardner, and the ALJ failed to specify what activities are inconsistent with Dr. Madison's opinions and in any event, his activities are not inconsistent with those opinions.

First, as to the failure to develop the record argument, I disagree with Plaintiff. Plaintiff argues that "someone input [Dr. Madison's] contact information incorrectly into the disability report[.]" Pl.'s Op. Brief 7. But, the form in which Dr. Madison's name and address are listed indicates that it was "completed by claimant." Tr. 403 (listing Dr. Madison's address as 2530 NE Oregon Street); *see also* Tr. 228 (disability report showing same address for Dr. Madison). Plaintiff further states that a Disability Determination Services (DDS) analyst indicated that the address on the disability report was for a dentist. Pl.'s Op. Brief 7 (citing Tr. 271). That record, however, further supports that it was Plaintiff who provided the wrong address for Dr. Madison, not someone from the Social Security Administration or DDS erroneously "inputting" information into the disability report. Tr. 271 (Aug. 27, 2013 note by DDS analyst stating that she attempted to contact Plaintiff to get correct address for Dr. Madison because the address Plaintiff listed was for a dentist; further noting that the analyst called the number for Dr. Madison and left a voice mail asking for a call back and noting that Dr. Madison's voice mail indicated he

also worked for Good News Clinic so the analyst, "in the meantime," sent the information request there). Plaintiff notes that while there are records from the Good News Clinic in the Administrative Record, none are from Dr. Madison and it is unclear if Dr. Madison chose to respond to the analyst's request with only his opinion letter or if his records were never properly requested. Plaintiff argues that regardless of the cause, the ALJ erred by rejecting Dr. Madison's opinion as inconsistent with the medical records when two years of counseling records are missing.[7]

The primary burden of proof is on Plaintiff. 20 C.F.R. §§ 404.1512(c), 416.912(c) (2015) ("You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled"). While the Commissioner will request medical records, the Commissioner relies on the claimant's identified medical sources to obtain these records. 20 C.F.R. §§ 404.1512(d), 416.912(d) (2015). Plaintiff was represented at the hearing and made no objection to the exhibits being admitted. Tr. 5. In response to the ALJ's question of whether Plaintiff had any new exhibits, Plaintiff's counsel said "[n]o." *Id.* Plaintiff did not request that the record be held open in an effort to obtain Dr. Madison's chart notes. While the ALJ has a duty to develop the record and assure the claimant's interests are considered, even when represented by counsel, *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001), the only indication from counsel was that the record was complete.

Moreover, the ALJ did *not* rely on the absence of contemporaneous chart notes in rejecting Dr. Madison's opinion. While Plaintiff argues that any inconsistency with the medical

---

[7] There is one short chart note by Dr. Madison dated August 14, 2012 which is contained within the several pages of medical records from Good News Community Health. Tr. 393.

record cannot be fairly assessed without Dr. Madison's chart notes, the letter summaries, which discuss the test results and findings, suffice. Additionally, it may be reasonably assumed that the chart notes fully support Dr. Madison's opinions. Thus, the ALJ did not fail to fully develop the record by failing to acquire Dr. Madison's chart notes of counseling sessions before assessing whether the record was inconsistent with Dr. Madison's opinions.[8]

As noted above, the ALJ rejected Dr. Madison's opinions as being inconsistent with "the rest of the medical record that shows the claimant has remained relatively stable for over two and a half years with no need for hospitalizations." Tr. 93. Plaintiff initially complains that the ALJ's reasoning here is vague because the ALJ provides no citation to a specific record in support of her finding. But, earlier in her opinion, the ALJ found that when Plaintiff abstains from alcohol and maintains his medication regimen, he is "quite functional" and had only three psychiatric hospitalizations since his alleged onset date in 2002, all of which coincided with a lapse in taking his medications. Tr. 90. The ALJ noted that after his medications were reinitiated and he slept, he quickly stabilized. *Id.* The ALJ found that after Plaintiff's last hospitalization in March 2013, his symptoms had generally been stable and have continued to be controlled with treatment. *Id.* The evidence in support of her finding is recited in the next two pages of her decision. Tr. 90-91. Because the ALJ discussed the evidence elsewhere in her opinion, Plaintiff's contention that the ALJ's rejection of Dr. Madison's opinion is vague and unsupported is without merit. *See Perkins v. Colvin*, 45 F. Supp. 3d 1137, 1149 (D. Ariz. 2014) (finding ALJ's discussion of inconsistent treatment notes that appeared earlier in the ALJ's decision sufficient to support rejection of

---

[8] Given my disposition of the case, Plaintiff should have the opportunity to obtain a complete copy of Dr. Madison's records, or provide the correct address to Defendant to obtain the records, so that the Administrative Record is complete.

examining physician's opinion); *Evenhus v. Astrue*, 815 F. Supp. 2d 1154, 1159-60 (D. Or. 2011) (finding ALJ's thorough discussion and evaluation of the medical evidence later in the decision was satisfactory to support finding at step three).

My prior discussion of the ALJ's recitation of the medical evidence is relevant here. As explained above, the ALJ's characterization of the post March/April 2013 evidence is supported by substantial evidence in the record. Thus, the ALJ did not err in finding that Dr. Madison's opinion was inconsistent with the records for the period of time commencing in spring 2013. But, the case law establishes that inconsistency with the medical evidence is not a basis for rejecting a treating practitioner's opinion. "If the treating physician's medical opinion is inconsistent with other substantial evidence in the record, '[t]reating source medical opinions are still entitled to deference and must be weighted using all the factors provided in 20 CFR [§ ] 404.1527.'" *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (quoting Soc. Sec. Ruling (SSR) 96-2p[9]). As *Holohan*, still quoting from SSR 96-p2, explained,

> "[a]djudicators must remember that a finding that a treating source medical opinion is. . . inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. . .. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."

*Id.* (quoting SSR 96-2p). In this case, whether the ALJ erred in rejecting Dr. Madison's opinion depends on the other bases she articulated in support.

The ALJ found Dr. Madison's opinion to be inconsistent with statements of Dr. Sayson

---

[9]  SSR 96-2p was rescinded on March 27, 2017 but only for claims filed on or after that date. *See* 2017 WL 3928298 (Notice of Rescission of Certain SSRs). Because Plaintiff's claim was filed before March 27, 2017, SSR 96-2p still governs the ALJ's analysis of his treating practitioners.

and Dr. Gardner. At a September 3, 2013 office visit with Dr. Sayson, Plaintiff wondered about getting on disability because of his bipolar disorder. Tr. 381. At that time, Dr. Sayson diagnosed Plaintiff with anxiety, PTSD, fatigue, and bipolar affective disorder. *Id.* Dr. Sayson noted that Plaintiff was less depressed and less anxious. *Id.* In a section of his chart note under "Plan," and then "Other Treatment," Dr. Sayson stated that he "did not encourage disability application as he is still very young and getting better." *Id.* This is the statement the ALJ found to contradict Dr. Madison's disability opinions. I agree with Plaintiff that Dr. Sayson's statement is not an opinion that Plaintiff did not qualify for disability. It is not an assessment of Plaintiff's functional capacities. It is merely a note that he did not encourage Plaintiff's disability application. Additionally, the ALJ failed to note that while both Dr. Sayson and Dr. Madison were treating practitioners, Dr. Madison is the specialist because he was a mental health professional engaged solely to treat Plaintiff's mental health issues.

In a June 20, 2014 chart note, Dr. Gardner noted that Plaintiff had a diagnosis of bipolar disorder which had led to a few hospitalizations. Tr. 419. Plaintiff talked to her about treatment for his ongoing anxiety. *Id.* She recited his diagnoses as bipolar disorder, generalized anxiety disorder, and alcohol dependence in remission. *Id.* She further remarked that he had problems with his primary support group and problems related to the social environment. *Id.* She noted his symptoms to be moderate and gave him a Global Assessment of Functioning (GAF) score of 54. *Id.* In the "Plan" section of her chart note, she noted, among other things, that she was considering a referral to "DVR," or "Supported Employment," or "Better People," to help Plaintiff get re-established in the workforce. *Id.* The ALJ found the statement by Dr. Gardner that she considered referring Plaintiff to vocational services to be inconsistent with Dr. Madison's

opinion.  The ALJ did not mention, however, that Dr. Gardner's reference to vocational

rehabilitation was one of several possibilities she was considering, including supported

employment options.  Her statement is not an opinion that Plaintiff is not disabled and is not a

clear indication that he could work in regular competitive employment at a level of substantial

gainful activity.  And, while Dr. Gardner is a psychiatrist, she made this statement at the end of

her first meeting with Plaintiff.  In contrast, Dr. Madison had treated Plaintiff for fifteen or

twenty months at the time he offered his September 2013 and February 2014 opinions.  The ALJ

failed to note this longitudinal history.

Neither of the two treating practitioners' statements cited by the ALJ contradict Dr.

Madison's opinions.  Thus, they are not a specific and legitimate basis for assigning his opinions

limited weight.

The ALJ also relied on Plaintiff's daily activities to reject Dr. Madison's opinions.  Tr. 93-

94 ("Dr. Madison's opinions are inconsistent with the claimant's activities of daily living, which

demonstrate he is capable of at least simple work.").  Plaintiff notes that the ALJ gave no

examples and cited to no records to support her finding.  Although the ALJ previously discussed

Plaintiff's activities in rejecting his subjective statements, the ALJ provided no specific examples

of which activities actually undermined Dr. Madison's opinion that Plaintiff's impairments mean

he cannot function under the stress of the work environment.  More importantly, Plaintiff's daily

activities as recited by the ALJ are not actually inconsistent with Dr. Madison's opinion.  Dr.

Madison himself observed that Plaintiff has anxiety about both places and people but when he

has a chance to get comfortable with people, he can "sometimes settle in with effort[.]" Tr. 402.

He also recognized that Plaintiff's medications give him relief.  *Id.*  He opined that Plaintiff was

somewhat stabilized on his medications.  *Id.*  His stability depends on proper medications and support.  *Id.*  It also involves staying in stress-free environments.  *Id.*

Plaintiff's activities are consistent with Dr. Madison's opinions.  When on his medications, he is fairly stable.  He is capable of leaving his home but this is consistent with the opinion that new places and people tend to provoke his anxiety but once he gets comfortable, he can "settle in[.]" He can occasionally perform odd jobs, can visit the dog park, can be with family and friends, and can go to a gym.  But again, the description of these activities is not inconsistent with Dr. Madison's opinion.  The ALJ found that Plaintiff's activities show he can perform some simple tasks and that he has some capacity to be around people.  Dr. Madison's opinions are not inconsistent with these findings.  Instead, his opinion essentially is that placing Plaintiff in a competitive, full-time work environment is more than Plaintiff can handle.  Even if Plaintiff were performing simple tasks and became comfortable with the people and workplace, the stress of the competitive work place is beyond Plaintiff's capabilities, even considering his relative stability on his medications.  Because Plaintiff's activities do not actually undermine Dr. Madison's opinions, the ALJ erred in relying on them to give his opinions limited weight.

The ALJ failed to provide any specific and legitimate reasons to reject Dr. Madison's opinions other than the inconsistency with the medical evidence.  Because, as explained above, inconsistency with the medical evidence is not a basis for outright rejecting the opinion of a treating practitioner, the ALJ's determination to give "limited weight" to Dr. Madison's opinions was erroneous.

III.  Step Three Listed Impairment

Plaintiff argues that the ALJ erred by failing to find him disabled at step three.  He

contends that the record supports a determination that he meets the criteria of Listing 12.04. Listing 12.04 governs affective disorders which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (2015). The required severity of the listing is met when both the "A" and "B" criteria are satisfied, or the "C" requirements are satisfied. *Id.*

The "A" criteria require "[m]edically documented persistence, either continuous or intermittent," of one either depressive syndrome, manic syndrome, or bipolar syndrome. *Id.* § 12.04A. Each syndrome has specific characteristics which must be satisfied. *Id.* The ALJ did not mention the "A" criteria. Tr. 88.

The "B" criteria require satisfaction of two of the following: (1) marked restriction in activities of daily living; (2) marked restriction in maintaining social functioning; (3) marked restriction in concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *Id.* § 12.04B. The ALJ found that the "B" criteria were not met because Plaintiff had moderate restrictions in activities of daily living, in maintaining social functioning, and in concentration, persistence, or pace. Tr. 88. The ALJ also found that he had experienced no episodes of extended duration which requires a showing of three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id.*

The "C" criteria require a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medical or psychosocial support," along with one of three additional requirements: (1) repeated episodes of decompensation, each of extended duration; or (2) a "residual disease process that has resulted in

such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicated to cause the individual to decompensate"; or (3) "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04C (2015). As to the "C" criteria, the ALJ wrote that the

> claimant does not have a history of repeated episodes of decompensation or a residual disease process that [has] resulted in such marginal adjustment [so] that even a minimal increase in mental demands or change in environment would predict[ably] [] cause an episode of decompensation. The claimant also does not have a current history of inability to function outside of a highly supportive living arrangement with an indication of a continued need for such arrangement. The claimant does not have a complete inability to function independently outside the area of his home.

*Id.*

Plaintiff argues that the discussion at step three was "too conclusory" and that the record shows he meets the "A" and "B" criteria. Pl.'s Op. Brief 8. First, Plaintiff cites to evidence in the record regarding his disturbed sleep, loss of interest in activities, decreased energy, difficulty concentrating/easy distractability, flight of ideas, and his engagement in activities with a high probability of painful consequences during episodes of mania. His contentions suggest that he relies on § 12.04A1 regarding depressive syndrome, although it is not entirely clear because he also cites to one of the criteria for establishing manic syndrome under § 12.04A2.

He then takes issue with the ALJ's characterization of the assessment of the "B" criteria as moderate, contending that the record shows a greater level of impairment. He also cites to his range of GAF scores over the years, from 20 to 65, as a "useful measure" to consider even if not determinative of disability.

Finally, Plaintiff argues that the ALJ provided no "real explanation" for why he did not meet the "C" criteria, instead offering only conclusory statements that he failed to meet any of the three requirements. He suggests that his periods of incarceration, emergency room visits and hospital admissions, living in halfway houses, and now residing with his parents, are all evidence of either the second or third requirement of the "C" criteria or at least should establish symptoms "equal" to the first requirement given that these are repeated episodes of decompensation of shorter length.

As to the "A" and "B" criteria, I agree with Defendant that the ALJ did not err. The ALJ's conclusion that Plaintiff did not have marked limitations in two of the first three "B" criteria was a reasonable conclusion drawn from substantial evidence in the record. Plaintiff's argument that his abilities were markedly impaired is not an unreasonable interpretation of the evidence, but, when there is more than one reasonable conclusion, the court must follow the ALJ's decision. *Vasquez*, 572 F.3d at 591 ("Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed.") (internal quotation marks omitted).

However, as to the "C" criteria, I agree with Plaintiff that the ALJ set forth only conclusory determinations without explanation. In the context of evaluating the "C" criteria, the ALJ failed to note Plaintiff's periods of incarceration, his halfway house residences, and that he continues to live with this parents. The ALJ failed to discuss the time period before March/April 2013 which the record suggests included unstable symptoms with periods of mania as well as volatility and aggression. The record contains enough evidence to suggest that Plaintiff might have met the requirements, perhaps for a discrete period of time, of some of the "C" criteria. Therefore, the ALJ erred at step three by failing to more thoroughly discuss the evidence relevant

to this portion of listed impairment 12.04.   However, while the ALJ erred at this step, I do not find that Plaintiff has established that he has met the requirements of Listing 12.04C for the entire period of claimed disability.   Thus, this issue will be better addressed by the ALJ upon remand.

IV.  Lay Witness Testimony

Plaintiff's mother provided written lay witness testimony about Plaintiff's impairments. Tr. 204-11, 255-62, 263-70.  "Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account." *Molina*, 674 F.3d at 1114.  The ALJ must give reasons "germane" to the witness when discounting the testimony of lay witnesses.  *Valentine*, 574 F.3d at 694.

The ALJ considered the mother's statements but gave them only partial weight.  Tr. 93. The ALJ noted that the mother last made statements in September 2013 and the record showed that Plaintiff continued to be stable, had well-controlled symptoms, and had no hospitalizations for mania or any extended manic episodes since March 2013.  *Id.*  The ALJ also noted that the alleged severity of medication side effects was not supported in the record.  *Id.*  The ALJ explained that although Plaintiff reports occasional periods of low energy and tiredness, he generally denied side effects from his medications and presented with normal mental status examinations.  *Id.*

Plaintiff argues that the ALJ erred in rejecting his mother's testimony.  First, Plaintiff notes that even with records showing improvement since March 2013, it is unclear why the ALJ did not at least credit Plaintiff's mother's statements through March 2013.  Second, Plaintiff notes that contrary to the ALJ's finding, the record includes significant evidence of fatigue, lethargy,

and listlessness which should have been considered whether they are a symptom of an impairment or a medication side effect. In response, Defendant simply repeats the ALJ's arguments. Def.'s Brief 13, ECF 20.

As explained above, the ALJ's review of the medical evidence and the finding that it shows stability of symptoms and improvement since March 2013 is supported by the record. Plaintiff's mother's third-party function reports are all dated after that time period. Tr. 204-11 (Apr. 29, 2013); Tr. 255-62 (Aug.27, 2013); Tr. 263-70 (Sept. 3, 2013). For each report, it is clear that Plaintiff's mother assesses Plaintiff's condition and limitations as of the current date. The forms do not ask for a retrospective evaluation. Thus, the ALJ did not err in concluding that Plaintiff's mother's statements were inconsistent with the relevant medical evidence of that time period. This is a germane reason, supported by substantial evidence, for rejecting Plaintiff's mother's testimony. Because that is all that is needed to affirm the ALJ on the lay witness issue, I do not discuss Plaintiff's other argument about his lethargy. The ALJ did not err in giving Plaintiff's mother's testimony only partial weight.

V. Remand for Additional Proceedings

In social security cases, remands may be for additional proceedings or for an award of benefits. *E.g., Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014) (explaining that if "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded[,]" but "in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits") (internal quotation marks omitted).

To determine which type of remand is appropriate, the Ninth Circuit uses a three-part test.

*Id.* at 1020; *see also Treichler v. Comm'r*, 775 F.3d 1090, 1100 (2014) ("credit-as-true" rule has three steps). First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion. *Garrison*, 759 F.3d at 1020. Second, the record must be fully developed and further administrative proceedings would serve no useful purpose. *Id.* Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled. *Id.* To remand for an award of benefits, each part must be satisfied. *Id.; see also Treichler*, 775 F.3d at 1101 (when all three elements are met, "a case raises the 'rare circumstances' that allow us to exercise our discretion to depart from the ordinary remand rule" of remanding to the agency).

Even assuming for the purposes of this Opinion that all three elements of the "credit-as-true" rule have been met, I nonetheless determine that remand for further proceedings is appropriate in this case. The medical evidence after Plaintiff's March/April 2013 supports the ALJ's determination that Plaintiff's symptoms have stabilized and are fairly well managed by his medications. Thus, "an evaluation of the record as a whole creates serious doubt that the claimant is, in fact, disabled [as to that particular time period]." *Garrison*, 759 F.3d at 1021. In contrast, the medical evidence before that period is not discussed in the ALJ's opinion and even though his DIB insured period expired in 2006, the ALJ was obligated to discuss what evidence there is regarding his limitations before that time. The existing evidence reasonably suggests that Plaintiff suffered serious symptoms before his spring 2013 stabilization. Upon remand, the ALJ should more thoroughly discuss the entire disability period at issue and more specifically describe the evidence relative to the different periods of time. The ALJ should also more specifically discuss the 12.04C criteria and provide a more thorough explanation of the reasons

why Plaintiff does or does not meet those criteria.

CONCLUSION

The Commissioner's decision is reversed and remanded for additional proceedings.

IT IS SO ORDERED.

Dated this ___14___ day of ___September___, 2018


_Marco A. Hernández_
Marco A. Hernandez
United States District Judge